AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
2821 Dellrose Ave, Richmond, Virginia 23228 )
"SUBJECT PREMISES" )
)

AUG 3 1 2018

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

Case No. 3 18SW209

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
2821 Dellrose Ave, Richmond, Virginia 23228, hereinafter "SUBJECT PREMISES" as described inthe supporting affidavit and attachments

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized):*
 evidence related to passport fraud and related charges as specified in the Complaint and supporting affidavit incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 1542 | False statement in a passport application |
| 18 U.S.C. Section 1546 | Fraud and misuse of visas, permits, and other documents |
| 18 U.S.C. Section 911 | False claim to citizenship |

The application is based on these facts:
attached affidavit

☐ Continued on the attached sheet.

☑ Delayed notice of  10  days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

| S. David Schiller |
|---|

*Applicant's signature*

S. David Schiller, A.U.S.A.
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  8/31/2018

City and state:  Richmond, VA

/s/

Roderick C. Young
United States Magistrate Judge

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | ) |
| | ) CASE NO. 3:18SW209 |
| 2821 Dellrose Ave, Richmond, Virginia, | )        3:18SW210 |
| 23228 and a red Nissan Pathfinder with | ) |
| Virginia license plates (plate number XTZ-5667 | ) **UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR SEARCH AND SEIZURE WARRANTS**

I, Michael Hubert, being first duly sworn, hereby depose and state as follows:

**BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 2821 Dellrose Ave,

Richmond, Virginia 23228, hereinafter "SUBJECT PREMISES" and a red Nissan Pathfinder

with Virginia license plates (plate number XTZ-5667), hereinafter "SUBJECT VEHICLE"

further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the Diplomatic Security Service, United States

Department of State ("DSS"), and have been since October 18, 2017. I am presently assigned to

the Washington Field Office as a criminal investigator.  As a federal agent, I am authorized to

investigate violations of laws of the United States, and as a law enforcement officer I am

authorized to execute warrants issued under the authority of the United States.

3.      I have received training in law enforcement and criminal law from both the

Federal Law Enforcement Training Center in Glynco, Georgia and the U.S. Department of State

Diplomatic Security Service Basic Special Agent Course.  I have participated in and conducted

numerous investigations into various types of criminal violations, including travel document and

immigration fraud.

4.      This affidavit is based upon information that I have obtained from my personal observations, witness interviews, my training and experience, review of documentary evidence, and information provided to me by other members of the investigation.  Because this affidavit is submitted only for the limited purpose of establishing probable cause for a search warrant, it does not include all information known to the government as a result of the investigation.

5.      Based on my training and experience and the facts as set forth in this affidavit, I submit that there is probable cause to believe that **JUAN ARGUETA MARQUEZ** is using, and has used, the SUBJECT PREMISES to store evidence concerning, and commit and facilitate the commission of violations of making false statements in a passport application, in violation of Title 18, United States Code, Section 1542; Fraud and misuse of visas, permits, and other documents, in violation of Title 18, United States Code, Section 1546; making false claims to citizenship in violation of Title 18 United States Code, Section 911.  In addition, I submit that there is probable cause to believe that the SUBJECT PREMISES contain documents, records, correspondence, and other materials that constitute evidence, fruits and instrumentalities of the aforementioned crimes, and disposition of the proceeds from the crimes under investigation.  I submit that there is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## **PROBABLE CAUSE**

1.  On February 14, 2017 passport application #xxxxxx975 and #xxxxxx976 were submitted on behalf of "K.Y.D.-A." and "A.A.D." by their purported parents at the Lakeside Post Office in Richmond, Virginia.  Purported father **JUAN ARGUETA MARQUEZ** was present at the

time of execution and offered a Permanent Resident Card (PRC), with the Alien number

xxxxxx254, as his proof of identity and claimed U.S. Citizenship on the passport application.

The applicant swore to the veracity of, and signed the application, authorizing the United

States Department of State to issue a U.S. Passport to his two children.

2. At the time each passport application was executed, the Acceptance Agent identified that the

PRC was counterfeit due to the appearance of incorrect security features on the card which

triggered an investigation by the Department of State.

3. Person Centric Query checks show the Alien Number (A#xxxxxx254) listed on the PRC card

submitted by Juan Argueta Marquez, is not associated with him and instead belongs to

"V.D.".  A search of JUAN ARGUETA MARQUEZ'S full name and DOB returned an

A#xxxxxx986.  Additionally, USCIS reviewed a copy of the PRC and determined the receipt

number on the document (WAC0xxxxxx597) does not exist in the USCIS system and that it

appears to be completely fabricated.

4. On June 23, 2017, Special Agents with DSS assigned to the Philadelphia Resident Office

interviewed "V.D." and confirmed that the Alien Number (A#xxxxxx254) presented on the

counterfeit PRC was in fact assigned to her.

5. Consular Consolidated Database records show that the last action on JUAN ARGUETA

MARQUEZ'S Alien Number (A#xxxxxx986) was on February 6, 2008 when a notice was

sent to him indicating that his petition for asylum was denied. The counterfeit PRC presented

with the passport applications claimed an issuance of September 2, 2008.

6. JUAN ARGUETA MARQUEZ has violated Title 18, United States Code, Section 1542

(False statement in a passport application), Title 18 United States Code Section 1546 (Fraud

and misuse of visas, permits, and other documents) and Title 18 United States Code Section 911 (False claim to citizenship), in that he made false statements in an application for a United States Passport by representing himself as having current legal alien status and making claims to being a U.S. citizen, knowing said statements to be false, and that he willfully and knowingly used a forged identification to aid the unlawful activity with the intent to secure the issuance of a passport pursuant to the rules prescribed pursuant to such laws under the authority of the United States.

## SUBJECT PREMISES

1.      My investigation has revealed that JUAN ARGUETA MARQUEZ lives at the SUBJECT PREMISES with "B.M.D.D.", a daughter; "K.Y.D.-A."; and son, "A.A.D.".  JUAN ARGUETA MARQUEZ and "B.M.D.D." are listed as the owners of the SUBJECT PREMISES from the Henrico County Real Estate Assessment Division.

2.      On January 7, 2018 SA Bridges placed a surveillance vehicle in vicinity of the subject's residence. On January 7, 2018 SA Bridges observed, via surveillance cameras, THE SUBJECT VEHICLE.  This vehicle is registered to JUAN ARGUETA MARQUEZ, and "B.M.D.D.". During the course of the surveillance, video captured JUAN ARGUETA MARQUEZ entering and exiting the SUBJECT VEHICLE on multiple occasions.

3.      On January 19, 2018 SA Griffin and SA Chung conducted mobile surveillance of JUAN ARGUETA MARQUEZ, beginning at the SUBJECT PREMISES. SA Griffin and Chung witnessed JUAN ARGUETA MARQUEZ exit the SUBJECT PREMISES and enter the SUBJECT VEHICLE at approximately 0530.  JUAN ARGUETA MARQUEZ drove the SUBJECT VEHICLE to an employment location at 13167 Telcourt Rd., Ashland, Virginia.

4

4.    The SUBJECT PREMISES was also listed as the mailing address on the passport applications for "K.Y.D.-A." and "A.A.D." (application numbers: #xxxxxx975 and #xxxxxx976).

5.    On March 9, 2018, SA Markley and Griffin conducted surveillance at JUAN ARGUETA MARQUEZ's place of employment (13167 Telcourt Rd Ashland, Virginia). JUAN ARGUETA MARQUEZ was seen by SA Markley and Griffin departing the back entrance of Saville Produce and Process Company at the aforementioned address and getting into the SUBJECT VEHICLE.  At 1534 JUAN ARGUETA MARQUEZ departed and drove to the SUBJECT PREMISES.

6.    JUAN ARGUETA MARQUEZ continues to reside at the SUBJECT PREMISES. On August 13, 2018, SA Hubert and SA Friedman conducted surveillance at the SUBJECT PREMISES, and observed the SUBJECT VEHICLE parked outside of the residence during the course of the four hour surveillance, as well as a second vehicle registered to "B.M.D.D."

7.    Based on my training and experience, and information acquired from law enforcement officials, I know individuals who engage in passport and immigration document fraud maintain and store at their residences, storage sheds, and in their vehicles;

    a. relevant documentary evidence including various forms of counterfeit documentation;

    b. accurate, non-fraudulent, authentic documentation with correct information thereon;

5

c.  the means and equipment to produce counterfeit immigration documents,

including computers (used to both obtain other persons'' identification information and

produce counterfeit documents), printers, and laminating material and equipment.

## TECHNICAL TERMS

1.      Based on my training and experience, and information acquired from other law

enforcement officials with technical expertise, I know the terms described below have the

following meanings or characteristics:

a.        "Computer" means "an electronic, magnetic, optical, electrochemical, or

other high speed data processing device performing logical or storage functions, and includes

any data storage facility or communications facility directly related to or operating in

conjunction with such device."  See 18 U.S.C. § 1030(e)(1).

b.        "Computer hardware" means all equipment that can receive, capture,

collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or

similar computer impulses or data.  Computer hardware includes any data-processing devices

(including, but not limited to, central processing units, internal and peripheral storage devices

such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory

storage devices); peripheral input/output devices (including, but not limited to, keyboards,

printers, video display monitors, modems, routers, scanners and related communications devices

such as cables and connections), as well as any devices, mechanisms, or parts that can be used to

restrict access to computer hardware (including, but not limited to, physical keys and locks).

c.        "Computer passwords and data security devices" means information or

items designed to restrict access to or hide computer software, documentation, or data.  Data

security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a digital key to "unlock" particular data security devices.

        d.      IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

        e.      The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

        f.      "Website" consists of textual pages of information and associated graphic images. The teual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

        g.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

1.      As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or on other electronic storage media or digital devices.  As used herein, the terms "electronic storage media" and "digital devices" include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Thus, the warrant applied for would authorize the seizure of electronic storage media and digital devices or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

2.      *Probable Cause.*  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that if electronic storage media or digital devices are found on the SUBJECT PREMISES, there is probable cause to believe that the records and information described in Attachment B will be stored in the electronic storage media and digital devices for at least the following reasons:

8

a. Individuals who engage in passport fraud often use electronic devices, including, but not limited to, smart phones and computers to receive or transmit personal identification data for use in identity theft.

b. Individuals who engage in the foregoing criminal activity, in the event that they change computers, will often "back up" or transfer files from their old computers' hard drives to that of their new computers, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c. Computer, smart phone, and other digital device files, or remnants of such files, can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet. Electronic files downloaded to an electronic storage medium can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer or a smart phone, the data contained in the file does not actually disappear; rather, that data remains on the electronic storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the electronic storage medium that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or

9

"recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from an electronic storage medium depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

3.      *Forensic Evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence or information that establishes how electronic storage media or digital devices were used, the purpose of their use, who used them, and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be on electronic storage media and digital devices in the SUBJECT PREMISES because:

a.   Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for

10

creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregatable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

11

b.  Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, electronic storage media and digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

12

e. Further, in finding evidence of how electronic storage media or a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

4. *Methods To Be Used To Search Digital Devices.*  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a. Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized equipment, and software programs necessary to conduct a thorough search.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.  Digital data is particularly vulnerable to inadvertent or intentional modification or
destruction.  Searching digital devices can require the use of precise, scientific
procedures that are designed to maintain the integrity of digital data and to
recover "hidden," erased, compressed, encrypted, or password-protected data.
Recovery of "residue" of electronic files from electronic storage media also
requires specialized tools and often substantial time.  As a result, a controlled
environment, such as a law enforcement laboratory or similar facility, is essential
to conducting a complete and accurate analysis of data stored on digital devices.

c.  The volume of data stored on many digital devices will typically be so large that it
will be extremely impractical to search for data during the physical search of the
premises.  Smart phones capable of storing 64 gigabytes, flash drives capable of
storing 128 gigabytes, and desktop computers capable of storing 500 or more
gigabytes are now commonplace.  Consequently, just one device might contain
enormous amounts of data.

d.  Further, as discussed above, evidence of how a digital device has been used, the
purposes for which it has been used, and who has used it, may be reflected in the
absence of particular data on a digital device.  For example, to rebut a claim that
the owner of a digital device was not responsible for a particular use because the
device was being controlled remotely by malicious software, it may be necessary
to show that malicious software that allows someone else to control the digital
device remotely is not present on the digital device.  Evidence of the absence of
particular data or software on a digital device is not segregatable from the digital

14

device itself.  Analysis of the digital device as a whole to demonstrate the absence

of particular data or software requires specialized tools and a controlled

laboratory environment, and can require substantial time.

e.  Digital device users can attempt to conceal data within digital devices through a

number of methods, including the use of innocuous or misleading filenames and

extensions.  For example, files with the extension ".jpg" often are image files;

however, a user can easily change the extension to ".txt" to conceal the image and

make it appear that the file contains text.  Digital device users can also attempt to

conceal data by using encryption, which means that a password or device, such as

a "dongle" or "keycard," is necessary to decrypt the data into readable form.

Digital device users may encode communications or files, including substituting

innocuous terms for incriminating terms or deliberately misspelling words,

thereby thwarting "keyword" search techniques and necessitating continuous

modification of keyword terms.  Moreover, certain file formats, like portable

document format ("PDF"), do not lend themselves to keyword searches.  Some

applications for computers, smart phones, and other digital devices, do not store

data as searchable text; rather, the data is saved in a proprietary non-text format.

Documents printed by a computer, even if the document was never saved to the

hard drive, are recoverable by forensic examiners but not discoverable by

keyword searches because the printed document is stored by the computer as a

graphic image and not as text.  In addition, digital device users can conceal data

within another seemingly unrelated and innocuous file in a process called

15

"steganography."  For example, by using steganography a digital device user can

conceal text in an image file that cannot be viewed when the image file is opened.

Digital devices may also contain "booby traps" that destroy or alter data if certain

procedures are not scrupulously followed.  A substantial amount of time is

necessary to extract and sort through data that is concealed, encrypted, or subject

to booby traps, to determine whether it is evidence, contraband or

instrumentalities of a crime.

f.   Analyzing the contents of mobile devices can be very labor intensive and also

requires special technical skills, equipment, and software.  The large, and ever

increasing, number and variety of available mobile device applications generate

unique forms of data, in different formats, and user information, all of which

present formidable and sometimes novel forensic challenges to investigators that

cannot be anticipated before examination of the device.  Additionally, most smart

phones and other mobile devices require passwords for access.  For example, even

older iPhone 4 models, running IOS 7, deployed a type of sophisticated

encryption known as "AES-256 encryption" to secure and encrypt the operating

system and application data, which could only be bypassed with a numeric

passcode.  Newer cell phones employ equally sophisticated encryption along with

alpha-numeric passcodes, rendering most smart phones inaccessible without

highly sophisticated forensic tools and techniques, or assistance from the phone

manufacturer.  Mobile devices used by individuals engaged in criminal activity

are often further protected and encrypted by one or more third party applications,

of which there are many.  For example, one such mobile application, "Hide It

Pro," disguises itself as an audio application, allows users to hide pictures and

documents, and offers the same sophisticated AES-256 encryption for all data

stored within the database in the mobile device.

g.   Based on all of the foregoing, I respectfully submit that searching any electronic

storage media or digital device for the information, records, or evidence subject to

seizure pursuant to this warrant may require a wide array of electronic data

analysis techniques and may take weeks or months to complete.  Any pre-defined

search protocol would only inevitably result in over- or under-inclusive searches,

and misdirected time and effort, as forensic examiners encounter technological

and user-created challenges, content, and software applications that cannot be

anticipated in advance of the forensic examination of the media or devices.  In

light of these difficulties, your affiant requests permission to use whatever data

analysis techniques reasonably appear to be necessary to locate and retrieve

digital information, records, or evidence within the scope of this warrant.

h.   In searching for information, records, or evidence, further described in

Attachment B, law enforcement personnel executing this search warrant will

employ the following procedures:

1.   Upon securing the SUBJECT PREMISES, law enforcement

personnel will, consistent with Rule 41(e)(2)(B) of the Federal

Rules of Criminal Procedure, seize any electronic storage media or

digital devices, as defined above, deemed capable of containing the

17

information, records, or evidence described in Attachment B and

transport these items to an appropriate law enforcement laboratory

or similar facility for review.  For all the reasons described above,

it would not be feasible to conduct a complete, safe, and

appropriate search of any such electronic storage media or digital

devices at the PREMISES.  The electronic storage media and

digital devices, and/or any digital images thereof created by law

enforcement in aid of the examination and review, will be

examined and reviewed by law enforcement personnel in order to

extract and seize the information, records, or evidence described in

Attachment B.

2.  The analysis of the contents of any seized electronic storage media

or digital devices may entail any or all of various forensic

techniques as circumstances warrant.  Such techniques may

include, but shall not be limited to, surveying various file

"directories" and the individual files they contain (analogous to

looking at the outside of a file cabinet for the markings it contains

and opening a drawer believed to contain pertinent files);

conducting a file-by-file review by "opening," reviewing, or

reading the images or first few "pages" of such files in order to

determine their precise contents; "scanning" storage areas to

discover and possibly recover recently deleted data; scanning

18

storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3. In searching the seized electronic storage media or digital devices, the forensic examiners may examine as much of the contents of the electronic storage media or digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the seized electronic storage media or digital devices will be specifically chosen to identify only the specific items to be seized under this warrant.

## CONCLUSION

1.      Based on the foregoing, I have probable cause to believe that within the

SUBJECT PREMISES and SUBJECT VEHICLE, as further described in Attachment A, and

incorporated herein by reference, there is evidence violations of making false statements in a

passport application, in violation of Title 18, United States Code, Section 1542; Fraud and

misuse of visas, permits, and other documents, in violation of Title 18, United States Code,

Section 1546; making false claims to citizenship in violation of Title 18 United States Code,

Section 911, and that the items listed in Attachment B, constituting evidence, fruits or

instrumentalities of those violations, will be located therein.  I therefore respectfully request that

the Court issue a warrant authorizing me and other law enforcement officers to search the

SUBJECT PREMISES and SUBJECT VEHICLE described in Attachment A, and to seize the

items listed in Attachment B.


Respectfully submitted,


Michael H. Hubert, Special Agent
Diplomatic Security Service
United States Department of State


Subscribed and sworn to before me
on August 31, 2018:


/s/

Roderick C. Young
United States Magistrate Judge

20

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Richmond Division

IN THE MATTER OF THE SEARCH OF:　　　　)
　　　　　　　　　　　　　　　　　　　　)　　CASE NO. 3:18SW209
2821 Dellrose Ave, Richmond, Virginia　　　　)　　　　　　　　3:18SW210
23228　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)　　**UNDER SEAL**

## **ATTACHMENT A**

*Property to be searched*

1. The property to be searched is 2821 Dellrose Ave, Richmond, Virginia 23228.  The
SUBJECT PREMISES is a 1.5 story, 1,078 square foot home, with associated property
and outbuildings.  The SUBJECT PREMISES sits at the corner Dellrose Ave and Galaxie
Rd. The SUBJECT PREMISES is white in color, with a gray roof.  The SUBJECT
PREMISES has North-facing front door with a red front porch and steps. The SUBJECT
PREMISES also has an outbuilding on the south edge of the property within a chain link
fenced off backyard.



**Last Photo Update 08/15/2016**



Photo Update 08/13/18



2

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Richmond Division

IN THE MATTER OF THE SEARCH OF:      )

2821 Dellrose Ave, Richmond, Virginia    )
23228                                  )

CASE NO. 3:18sw 209
3:18sw 210

**UNDER SEAL**

**ATTACHMENT B**

*Property to be seized*

1.    The items to be seized are fruits, evidence, records and information relating to,

contraband, or instrumentalities of violations of making false statements in a passport

application, in violation of Title 18, United States Code, Section 1542; Fraud and misuse of

visas, permits, and other documents, in violation of Title 18, United States Code, Section 1546;

making false claims to citizenship in violation of Title 18 United States Code, Section 911, in the

Eastern District of Virginia, in Attachment A:

        a.    All records, documents and communications or other information related to the

             immigration status of JUAN ARGUETA MARQUEZ including passports,

             applications for status with the Department of Homeland Security and subsidiary

             entities;

        b.    All citizenship documents and residency status documents relating to JUAN

             ARGUETA MARQUEZ, including driver's licenses, birth certificates, and social

             security cards;

   c.  All records, documents and communications or other information related to or showing compensation given in exchange for the obtaining or exchange of United States citizen documentation such as birth certificates;

   d.  Passports both foreign and domestic, visas, tickets, photographs, and other evidence related to international travel, residency, or birth in a foreign country;

   e.  All records requesting new or updated birth certificates from any government or private entity;

   f.  Any records, documents and communications, handbooks, instructions or other documents showing knowledge, instructions or guidance regarding the U.S. immigration laws, applications or process for seeking immigration benefits;

   g.  All records, documents and communications or other information showing payments, including logs or records by, to or from others with regards to immigration benefits sought or obtained;

   h.  Any item clearly identifiable as contraband.

2.    For any electronic storage media or digital device whose seizure is otherwise authorized by this warrant, and any electronic storage media or digital device that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software, or the lack thereof, that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

d.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

e.  evidence of the times the COMPUTER was used;

f.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

g.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

h.  records of or information about Internet Protocol addresses used by the COMPUTER;

i.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The terms "electronic storage media" and "digital devices" include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

4